# EXCLUSIVE U.S. REPRESENTATION AND IMPORTATION AGREEMENT

Bodegas Corral, S.A., Tax ID No. CIF A26011833, a business entity organized in Spain, with offices located at Carretera Logroño KM10, 26370 Navarrete, La Rioja, Spain ("Exporter"), and Terroir Connections, LLC, EIN No. 85-2046403, a Florida limited liability company organized in the United States, with offices located at 8517 Gunn Hwy, Odessa, FL 33556 USA ("Importer"), hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties", hereby execute and enter into this Exclusive U.S. Representation and Importation Agreement (the "Agreement") as of the 8th day of , 2021 (the "Effective Date"), and in doing so agree as follows:

WHEREAS, Exporter is a foreign manufacturer of certain fine wine and/or spirits products; and

WHEREAS, Exporter intends to export to the United States generally (herein, the "Territory") the particular labels and/or bulk wine and/or spirits produced by Exporter and listed on Schedule "A" attached hereto and incorporated herein (collectively the "Products and Brands"). Schedule "A", Schedule "B" (Price) and Schedule "C" (Compensation) are attached hereto and incorporated herein; and



WHEREAS, Exporter seeks to establish a representation and importation relationship based on mutual respect with an importer and is committed to working with Exporter to achieve significant and successful market development of the Products and Brands; and

WHEREAS, Exporter agrees to pay the Retainer as set forth in Schedule "C" (Compensation); and

WHEREAS, Importer is a duly licensed importer and now holds, or has submitted applications for, all federal and state licenses necessary to conduct the activities contemplated by this Agreement, or has appointed a duly licensed sub-importer; and

WHEREAS, Importer desires to work with Exporter as its exclusive trading partner, brand representative and importer to introduce the Products and Brands to the United States, and towards that goal is committed to devoting its best efforts in the form of distribution management and skills to promote customer sales and secure the successful development of the Products and Brands in the market. Importer agrees to pay the price as set forth in Schedule "B",

NOW THEREFORE, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, Exporter and Importer agree to the following terms and conditions:

1. **Term.** Except as otherwise provided, this Agreement shall commence on the Effective Date and shall be valid for one (1) year. This Agreement shall renew automatically for one (1) additional Term unless otherwise terminated by either party as provided herein. During the additional Term and before its termination date, this Agreement can be extended for additional one (1) year terms upon written agreement between the Parties.

1

**EXHIBIT A**

2. Appointment. Subject to the terms and conditions of this Agreement, Exporter hereby appoints Importer as the exclusive trading partner, branding representative and importer for each of the Products and Brands in the Territory, and Importer hereby accepts this appointment.

2.1 Exporter understands and acknowledges that Importer may appoint a sub-importer under the terms and conditions specified in this Agreement. Exporter shall not appoint another importer or wholesale distributor for the Products and Brands in the same Territory while this Agreement is in effect. Importer's exclusive appointment made herein shall not prevent Importer from becoming an importer for another alcohol beverage supplier's brands at any time during the Term of this agreement.

2.2 As an ongoing obligation, Exporter shall promptly amend Schedule "A" whenever it is mutually agreed with the Importer to select a new or existing product for importation to the Territory. Exporter shall provide written notice to Importer, at no less than thirty (30) days, Exporter's new product and request to amend Schedule "A". Importer shall then have fifteen (15) days, in its sole discretion to either accept or reject the request to amend Schedule "A".

2.3 Importer shall be authorized to register itself, or its sub-importer, with each relevant regulatory authority operating in the Territory as the "Primary American Source" for the Products and Brands in the Territory.

2.4 As the exclusive importer of the Products and Brands for the Territory, Importer shall exercise its business judgment to identify and appoint duly authorized and licensed wholesale distributors located in the Territory. This Agreement does not preclude Importer from becoming licensed as a distributor and/or from performing said distribution functions itself through a related or affiliated entity.



3. Supply and Sales

3.1 Exporter agrees to supply to Importer such volumes of the Products and Brands as are required by Importer for importation and sale within the Territory pursuant to this Agreement. Exporter agrees that all volumes of Product supplied to Importer or to any third party importer purchasing on behalf of one of Exporter's clients, will be on consignment for 180 days or until such time as the Products and Brands are sold in whole or in part, whichever occurs first. Exporter shall retain ownership of any and all consigned Product until it is sold. Importer shall only accept Products and Brands in good condition to sell according to industry standards and practices.

3.2 In producing and packaging the Products and Brands products, Exporter shall comply with the industry's customary and established quality standards or as specified by the importer. Exporter warrants that Products and Brands shall be packaged, labeled, marked, and shipped by Exporter in accordance with the importers requirements, which reflect the then current regulatory United States requirements.

3.3 Exclusivity. Importer will grant exclusivity to the Products and Brands in the region, denomination of origin, geographical indication, appellation ("Appellation"), product style and type as set forth in Schedule "A", and on its price segment as set forth in Schedule "B", and will therefore not enter into any agreement with other exporters within the same denomination of origin, region, price segment, product type and style.

3.4    Type and Style. Product type and style ("Classification") of the Products and Brands are set forth in Schedule "B.

3.5    Price. The purchase price(s) of Products and Brands that Exporter will sell to Importer is EX Works in accordance with Incoterms 2020, and established as set forth in Schedule "B".. Exporter shall provide at least sixty (60) days prior written notice of any proposed price increase. Importer shall have fifteen (15) days to either accept or reject the proposed price increase and if accepted the parties hereto shall amend Schedule "B" forthwith.

3.6    Order. All orders for Products and Brands under this Agreement shall be made by Importer specifying the type of Products and Brands ordered and the quantities therefore. Upon acceptance by the Exporter, each such order shall constitute a binding obligation between Exporter and Importer in accordance with the terms of this Agreement.

3.7    Pick-up / Delivery. Shipments will be picked up EXW or the applicable location as designated by Exporter in consultation with Importer. If terms other than EXW are agreed, Importer shall reimburse Exporter for costs associated with any in-land freight based on the rate reported to Importer by Exporter. Title and risk of loss for the Products and Brands shipped to Importer will pass when the Goods are received by Importer.



3.8    Logistics and warehousing. Importer shall be responsible for all logistics, distribution, sale and delivery of product sold within the Territory on behalf of Exporter. Exporter will have a complimentary, no cost, handling and warehousing allowance of up to two (2) standard pallets, or up to 120 cases of wine or spirits at Importer's warehouse facilities. Exporter will be responsible for any storage and handling costs for additional cases over the complimentary warehousing allowance. This cost will be assessed and submitted to the Exporter for approval and payment as needed.

3.9    Agreement to sell. Exporter grants Importer an exclusive right to sell the Products and Brands in the Territory as listed in Schedule A attached hereto.

3.10   Payment Terms. Importer agrees to make payment to Exporter for the full amount of the sale price established in Schedule B plus any other import costs associated with the sale of the Products and Brands 10 business days of receipt of the sale, or no later than 180 days after the date of receipt and acceptance of any shipment by Importer, whichever occurs first. All payments to Exporter will be accompanied by a complete and accurate inventory of the Products and Brands sold.

3.11   Samples. Exporter agrees to provide an adequate sample allowance to the Importer in order to promote the Products and Brands at the point of market entry and to stimulate sales. For this purpose, the Exporter agrees to provide an allowance of free samples equal to 7% of the first shipment or at least one case of 12 bottles per brand, 5% of the second shipment and 2% of any subsequent shipment unless a different percentage of samples per shipment is agreed between the parties..

3.12   Each Party agrees that at no time will either Party, directly or indirectly, contact or approach (or assist any person or entity to contact or approach) the suppliers, vendors, customers or employees of the other Party to solicit a direct relationship with such persons or entities. Each

Party agrees that, during the term of this Agreement and for a period of twelve (12) months thereafter, such Party will not, directly or indirectly, contact, solicit or enter into any distribution and/or importation agreement or induce or recruit (or assist any person or entity to contact, solicit, induce or recruit) any person who is, or within six months prior to the date of such solicitation was, an employee, agent or contractor of the other Party for the purpose of being employed or otherwise engaged by such soliciting Party or any other person or entity.

4. **Certificate of Label Approval.** Importer shall be responsible for securing all necessary licenses and registrations for marketing the Products and Brands in the Territory, including, but not limited to, securing a federal Certificate of Label Approval (COLA) for each Brand from TTB and registering the Products and Brands in each state of the United States where the Products and Brands will be distributed and sold.

5. **Intellectual Property and Confidentiality.**

   5.1 Intellectual Property.

   (a) Exporter grants Importer a limited, non-exclusive, non-assignable, non-licensable license to use Exporter's Intellectual Property in carrying out its obligations under this Agreement. "Intellectual Property" includes the current and future patents, trademarks, trade names, service marks, copyrighted materials, trade dress and other trade designations owned or controlled by Exporter (including such intellectual property as is licensed to Exporter by third parties) that relate to the Products and Brands and are expressly authorized by Exporter for Importer's use.



   (b) Importer will use the Intellectual Property only as approved by Exporter in writing and, at Exporter's request, will change or discontinue the way it uses any Intellectual Property. Importer will remove all Intellectual Property affixed to any property before leasing, selling, transferring or otherwise using such property in any way not connected with this Agreement. Importer will not use the Intellectual Property in conjunction with the intellectual property of any third party or with Importer's corporate or business name.

   (c) Exporter will protect and defend Importer against third party claims arising out of Importer's use of the Intellectual Property.

   5.2 Confidentiality.

   (a) The Confidential Information of both Exporter and Importer is confidential and proprietary and will be treated accordingly. "Confidential Information" of Exporter includes, but is not limited to: all current and future information about proposed and pending marketing plans and advertising; pricing proposals and new Products and Brands; business plans; market data; formulation and packaging of the Products and Brands; ownership and use of Intellectual Property; and any non-public information designated by Exporter as confidential. "Confidential Information" of Importer includes, but is not limited to, all current and future financial and ownership information which Importer provides to Exporter in connection with this Agreement.

(b) Exporter and Importer will take all necessary steps to maintain and protect the confidentiality of each other's Confidential Information and will not disclose any Confidential Information to a competitor or any other third party.

(c) If either Exporter or Importer breaches its obligations in this Section 5.2, the breaching party will reimburse the non-breaching party for all costs, attorneys' fees and other expenses incurred by the non-breaching party arising from such breach. In any action or proceeding by the other party to obtain a temporary restraining order, preliminary injunction, and/or other equitable relief, each party hereby agrees to waive the necessity of the other party's posting a bond of any amount in order to obtain the preliminary injunction, temporary restraining order and/or other equitable relief.

6. **Termination Rights.** The following provisions define the different means by which the parties may terminate this Agreement prior to its expiration, depending upon the applicable circumstances.

6.1 <u>Termination Under Certain Circumstances</u>: Either party may terminate this Agreement upon sixty (60) days written notice to the other party under any of the following circumstances:



(a) Either party permanently ceases business operations, or

(b) Either party declares bankruptcy, or

(c) Proper notice of termination is possible effective at the end of the contractual term. Notice must be given by either party, at least sixty (60) days prior to the effective termination date of the contract.

6.2 <u>Breach</u>. In addition to the specific circumstances outlined above, either Exporter or Importer may terminate this Agreement upon any other breach by the other party of any material provision or term of this Agreement, following delivery by the terminating party to the breaching party of written notice to the breaching party detailing the nature of the breach and identifying the day on which the Agreement's termination will take effect. However, either party's inability or failure to perform under this Agreement for up to ninety (90) days due to an event beyond the party's reasonable control (including but not limited to strikes, fires, floods, freezes, pandemics, accidents, wars, riots, insurrections, acts of God, acts of government, acts of terrorism, and raw material shortages) will not constitute a breach.

6.3 <u>No Cause</u>. The parties expressly agree that this Agreement may be immediately and automatically terminated by mutual agreement without cause.

6.4 Procedures Upon Termination or Other Expiration of Agreement:

(a) The termination letter must be sent via express courier service.

(b) Upon the effective date of termination, or other natural expiration of this Agreement, Importer immediately will cease all use of Exporter's Intellectual Property and Confidential Information (each as defined herein).

(c) Upon termination Importer will return all property belonging to Exporter at Exporter's expense.

(d) If Exporter terminates the agreement for any cause other than for Importer's breach of any material provision of this agreement, Exporter agrees to pay to Importer the Retainer portion of the Compensation owed in full for the remainder of the then active term of the agreement.

(e) Orders placed by Importer during the period between notice of termination and its effective date will be honored by Exporter, provided the following conditions are met: (a) such orders are in accordance with past purchasing practices; (b) such orders are scheduled for delivery prior to the effective date of termination; and (c) such orders are sufficient, along with Importer's existing inventory, to satisfy only Importer's demand for the Products and Brands in the Territory prior to the effective date of termination and not thereafter; and (d) such orders are subject to the same payment terms as outlined in 3.

7. Representations, Warranties And Covenants

7.1 Each Party represents, warrants and covenants to the other Party that:

(a) it has the right to enter into this Agreement and to perform fully all of its obligations in this Agreement;



(b) entering into this Agreement does not and will not conflict with or result in any breach or default under any other agreement to which such Party is subject;

(c) it will perform its obligations under this Agreement in compliance with all applicable federal, state and local laws and regulations;

(d) it shall be responsible for determining which permits are necessary for its performance hereunder and for obtaining such permits;

(e) it has adequate business liability insurance that will cover its performance hereunder and any injuries to its employees, contractors and other third parties;

(f) the execution of this Agreement by its representative whose signature is set forth below has been duly authorized by all necessary corporate action;

(g) it is responsible for obtaining, paying for and maintaining in force all licenses, consents, permits and approvals of all regulatory authorities whatsoever which are or may be necessary or advisable in connection with the carrying out any of its obligations pursuant to this Agreement; and

(h) it will comply with all applicable laws and regulations relating to the importation, transportation, distribution, storage, marketing, offer for sale and sale of its products.

8. Indemnification.

Exporter shall indemnify, protect, defend (with legal counsel approved by Importer) and hold Importer, including its licensees, assignees, parent, subsidiary, and affiliated companies, as well as the officers, directors, employees, shareholders, agents, and representatives of each of them, free and harmless from and against any loss, damage, injury, demand, cost, expense, or claim of any kind or character, including, but not limited to, attorneys' fees arising out of or related to (i) any breach by Exporter of its representations and warranties or obligations and duties in this Agreement; (ii) actual or alleged adulteration or misbranding of any of the Products and Brands; (iii) actual or alleged infringement of any United States or foreign patents, or any trademark or copyright; and (iv) liability imposed on Importer for bodily injury caused to any third party because of that third party's consumption or use of any of the Products and Brands due to any negligence or intentional bad acts by Exporter in the production or delivery to Importer of the Products and Brands.

Importer shall indemnify, protect, defend (with legal counsel approved by the parties) and hold Exporter, including its licensees, assignees, parent, subsidiary, and affiliated companies, as well as the officers, directors, employees, shareholders, agents, and representatives of each of them, free and harmless from and against any loss, damage, injury, demand, cost, expense, or claim of any kind or character, including, but not limited to, attorneys' fees arising out of or related to (i) any breach by Importer of its representations and warranties or obligations and duties in this Agreement; (ii) actual or alleged adulteration or misbranding by Importer of any of the Products and Brands.



9. Assignment

Neither Party shall assign any rights, or delegate or subcontract any obligations, under this Agreement without the other Party's prior written consent. Any assignment in violation of the foregoing shall be deemed null and void. Subject to the limits on assignment stated above, this Agreement will inure to the benefit of, be binding on, and be enforceable against, each of the Parties hereto and their respective successors and assigns.

10. Miscellaneous.

10.1 Notices. All notices under this Agreement shall be in writing and delivered to the addresses shown on the signature page below (or to any other address subsequently designated by written notice to the other party). Notices will be deemed to have been duly given: (a) on the date of personal service; (b) within forty-eight (48) hours of mailing by US Postal Service registered or certified mail if the recipient is located in the United States; e-mail of a PDF document (with confirmation of transmission) sent by Importer to Exporter to carlos@bodegascorral.com, and by Exporter to Importer to rafa@terroirconnections.com with a copy to jeff@terroirconnections.com; or (c) on the date of delivery by express overnight or other international courier.

10.2 Independence of Importer. Importer is and will remain an independent contractor retained under this Agreement by Exporter. Although the parties are working cooperatively, this

Agreement does not create a joint venture, partnership, principal agent, employer employee or any similar relationship at law between Exporter and Importer. Except as otherwise provided herein, neither Party shall have any right or power to represent or bind the other Party with respect to any third party or agreement with any third party. Importer acknowledges that it has paid no compensation to Exporter for the distribution rights contained herein.

10.3   Entire Agreement. This Agreement, and Schedules, constitute the entire understanding between Exporter and Importer and merges and supersedes all prior oral and written agreements or understandings concerning the subject matter herein.

10.4   Amendment. This Agreement may be amended only in writing signed by Exporter and Importer.

10.5   Governing Law. The rights and obligations of the parties under this Agreement will be governed by and construed under the laws of the State of Florida, United States of America.

10.6   Waiver. The failure of either party at any time to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of either party at a later time to enforce each and every such provision.

10.7   Section Headings; References; Days. The headings and captions contained in this Agreement are inserted only as a matter of convenience or reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any of its provisions. All references contained in this Agreement to Sections, Schedules, and Schedules shall be deemed to be references to Sections of, and Schedules and Schedules attached to, this Agreement. All references to Sections shall be deemed to also refer to all subsections of such Sections, if any. The definitions of terms defined in this Agreement shall apply to the Schedules. Any reference to a "day" or "days" shall mean calendar day or days.



10.8   Construction of Agreement, Expense. No word, phrase, clause, sentence or other language contained in this Agreement shall be construed or applied more harshly as to one party, as the drafter or proponent thereof. Each party has had the opportunity to seek such legal representation concerning the terms of this Agreement as each party desires. All Sections of this Agreement, and the language contained therein, have been negotiated between and by both parties. Each party shall pay its respective attorney fees and expenses for the negotiation and preparation of this Agreement, the Schedules and Schedules and the other agreements contemplated by this Agreement.

10.9   Counterparts, Facsimile. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same agreement. A facsimile or electronic copy of this Agreement, and any signatures thereon, shall be considered for all purposes as originals.

(THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)

This Agreement is hereby agreed to by and between the undersigned, each of whom represents and warrants that he/she is the duly authorized representative of the respective party, and that said party has authorized the execution of this Agreement:

**EXPORTER**

Bodegas Corral, S.A.
Carretera de Logroño Km 10
26370 Navarrete, La Rioja, Spain

By: _____

Name: Carlos Rubio
Title: CEO

Date:   February 8th, 2021

**IMPORTER**

Terroir Connections, LLC
8517 Gunn Hwy.
Odessa, FL 33556
USA

By: _____

Name: Rafael Nava
Title: General Manager

Date:   February 8th, 2021

## SCHEDULE A

## BRANDS AND TERRITORY

The "Products and Brands" and Exclusivity covered by this Agreement are:

Products, Brands and Regions: Wines from D.O. La Rioja, Spain

| Brand | Appellation | Classification |
|---|---|---|
| Altos del Corral, Crianza | D.O. Rioja | Red still wine |
| Altos del Corral, Reserva | D.O. Rioja | Red still wine |
| Don Jacobo Ecological, Blanco Eco | D.O. Rioja | White still wine |
| Don Jacobo Ecological, Rosado Eco | D.O. Rioja | Rosé still wine |
| Don Jacobo Ecological, Tempranillo Blanco Eco | D.O. Rioja | Red still wine |
| Don Jacobo Ecological, Vendimia Seleccionada Eco | D.O. Rioja | Red still wine |
| Don Jacobo Ecological, Crianza Eco | D.O. Rioja | Red still wine |
| Don Jacobo Classic, Crianza | D.O. Rioja | Red still wine |
| Don Jacobo Classic, Crianza 375ml | D.O. Rioja | Red still wine |
| Don Jacobo Classic, Reserva | D.O. Rioja | Red still wine |
| Don Jacobo Classic, Gran Reserva | D.O. Rioja | Red still wine |
| Vine Roots Classic, Garnacha | D.O. Rioja | Red still wine |
| Vine Roots Classic, Garnacha Blanca | D.O. Rioja | White still wine |
| Vine Roots Classic, Graciano | D.O. Rioja | Red Still wine |



### Territory:

All fifty states (50) of the United States of America, Washington DC and its territories including the Online market segment defined as licensed wine and spirits wholesalers and retailers who utilize internet and online based digital technologies such as desktop computers, mobile phones and other digital media and platforms to promote their products and services, and whose primary source of sales and distribution originates from ecommerce and online transactions.

## SCHEDULE B

## PRICING

| Brand | Vintage | EXW Price p/bot Carton* | EXW Price p/bot Wood case** | EXW Price p/bot Luxury Giftbox*** | EXW Price p/bot Magnun (1.5lts) carton* | EXW Price p/bot Luxury Giftbox Magnun (1.5lts)* |
|---|---|---|---|---|---|---|
| Altos del Corral, Crianza | 2016 | € 9.12 | € 9.92 | € 11.32 | € 15.95 | € 17.72 |
| Altos del Corral, Reserva | 2010 | € - | € 13.25 | € 16.31 | € - | € - |
| Don Jacobo Ecological, Blanco Eco | 2020 | € 2.86 | € - | € - | € - | € - |
| Don Jacobo Ecological, Rosado Eco | 2020 | € 2.86 | € - | € - | € - | € - |
| Don Jacobo Ecological, Tempranillo Blanco Eco | 2020 | € 3.05 | € - | € - | € - | € - |
| Don Jacobo Ecological, Vendimia Seleccionada Eco | 2019 | € 3.65 | € - | € - | € - | € - |
| Don Jacobo Ecological, Crianza Eco | 2017 | € 4.68 | € - | € - | € - | € - |
| Don Jacobo Classic, Crianza | 2016 | € 4.18 | € - | € - | € 7.47 | € - |
| Don Jacobo Classic, Crianza 12 x 375ml | 2016 | € 2.78 | € - | € - | € - | € - |
| Don Jacobo Classic, Reserva | 2015 | € 6.72 | € - | € - | € 10.98 | € - |
| Don Jacobo Classic, Gran Reserva | 2005 | € 12.55 | € - | € - | € - | € - |



\* 6 bots per carton case     \*\* 3 or 6 x 750ml bots p/wood case     \*\*\* 1 x 750ml bottle per Luxury giftbox

| Brand | Vintage | EXW Price p/bot Carton |
|---|---|---|
| Vine Roots Classic, Garnacha (1 or 6 bot x 750ml) | 2017 | € 14.65 |
| Vine Roots Classic, Garnacha (1 bot x 1.5lts) | 2017 | € 26.15 |
| Vine Roots Classic, Garnacha Blanca (1 or 6 bot x 750ml) | 2019 | € 11.70 |
| Vine Roots Classic, Garnacha Blanca (1 bot x 1.5lts) | 2019 | € 20.90 |
| Vine Roots Classic, Graciano (1 bot x 750ml) | 2018 | € 14.65 |
| Vine Roots Classic, Graciano (1 bot x 1.5lts) | 2018 | € 26.15 |

| Discount allowances p/invoice | 1 to 3 pallets | 4 to 5 pallets | 6 to7 pallets | 8 or more pallets |
|---|---|---|---|---|
| Only red wines | 5% | 10% | 15% | 20% |

## SCHEDULE C

## COMPENSATION

1. For trade assistance, representation, market development and other activities contemplated by this Agreement, Exporter agrees to pay Importer:

    1.1. A annual Retainer fee of: Eighteen Thousand U.S. Dollars (US$ 18,000.00) payable as follows:

    Equal monthly installments of One Thousand Five Hundred U.S. Dollars (US$ 1,500.00) due on the 1st business day of every month for the duration of the Term.

    The first monthly installment will be pro-rated from the Effective date to February 28th 2021. The first installment payment will be for One Thousand One Hundred Twenty Five U.S. Dollars (US$ 1,125.00) due on or before the 5th day from the Effective Date



2. Importer will pay Exporter 50% of the net-profit resulting from the sales of the Products and Brands after deducting costs, sales commissions estimated at 5% of sales price, landed costs, and any other federal, state or local applicable fees and taxes.